UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA      CASE NO. 17-cr-00313-01

VERSUS      CHIEF JUDGE HICKS

OCTAVIUS D WHITE (01)      MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Octavious D. White ("Defendant") is charged with possession with intent to distribute methamphetamine, possession of a firearm in furtherance of a drug trafficking crime, and felon in possession of a firearm.   Counsel for Defendant filed a Motion for Psychiatric Examination.   (Doc. 28).   The motion represented that a psychological evaluation of Defendant, as well as counsel's communications with Defendant, provided reasonable cause to believe that Defendant may not be competent to stand trial.  Doc. 28.

The court granted the motion and ordered Defendant to report to the Bureau of Prisons ("BOP") for a psychiatric evaluation.  Docs. 31 & 33.  The BOP submitted a forensic evaluation report that concluded that Defendant did not appear to be competent to proceed to trial and recommended that Defendant be committed to a federal medical center for restoration to competency.  Doc. 39.

Defendant was admitted to Federal Medical Center ("FMC") at Butner, North Carolina in January 2019.  Doc. 40.  In May 2019, the BOP submitted a second forensic evaluation report that found that Defendant's competency was restored.  Doc. 42.

Defendant retained a neuropsychologist, who conducted another evaluation of him in August 2019. She opined that Defendant was able to understand the nature and consequences of the proceedings against him but would not be able to assist properly in his defense due to his verbal and communication deficits.  Doc. 55-3.

A hearing on the competency issue was held on November 18, 2019.  The court heard testimony from three BOP psychologists and from Defendant's retained psychologist.  For the reasons that follow, it is recommended that the court find that Defendant is competent to stand trial.

**Relevant Facts**

### A.  Defendant's Background, Education and Drug Abuse

Defendant was born in March 1994 and is now 26.  He never graduated from high school and did not earn a GED.  He received special education in all subjects up until seventh or eighth grade, when he was transferred to an alternative school.  He was noted to demonstrate delays in reading, writing, and math.  Defendant was in an Individualized Education Program ("IEP") in second grade, which indicated that he had "severe and unique learning problems as a result of significant difficulties in the acquisition, organization, and expression of specific academic skills or concepts."  He was diagnosed with specific learning disabilities in the areas of reading, written expression, and math.  In eighth grade, he was reading at a third-grade level.

Defendant began smoking marijuana when he was 18 or 19, and he smoked marijuana daily until the date of his arrest. He also began abusing prescription pain

medication when he was 19. Defendant began using methamphetamine approximately three years ago, and he smoked it three to four times per day.

## B. Dr. Sentell's SSD Report

Dr. S. Webb Sentell, a medical neuropsychologist, evaluated Defendant in June 2016 to determine whether Defendant was qualified for Social Security Disability benefits. His report was filed under seal. Doc. 29. He noted that Defendant's "[v]ocabulary and speech pragmatics are somewhat limited but adequate for conversational purposes." Defendant showed no overt signs of psychosis, and his thought processes were full, linear, logical, and coherent. Cognitive screening revealed that his near and recent memory appeared to be intact. His cognitive abilities appeared "to be broadly within the mild range of intellectual disability." Dr. Sentell found that Defendant appeared to put forth good effort and that, overall, his results were a valid and credible estimate of Defendant's current mental status.

Dr. Sentell noted that Defendant had been diagnosed with (1) bipolar disorder with psychotic features, (2) adjustment disorder with mixed emotional features, (3) attention hyperactivity disorder, and (4) mild intellectual disability. Dr. Sentell found that Defendant could understand, follow, and carry out multiple step directions, but his concentration was variable, he required some redirection, and he had difficulty performing complex tasks. Dr. Sentell did not perform a formal cognitive assessment, but based on Defendant's history, clinical presentation, and cognitive screening, Dr. Sentell opined that Defendant was within the mildly intellectually disabled range.

## C. First BOP Forensic Evaluation

The first BOP forensic evaluation of Defendant was conducted by Dr. Jessica Micono, a forensic psychologist. Her initial interview of Defendant took place in July 2018, and her report was finalized in September 2018. During the interview, Defendant "appeared to have some difficulty tracking the information presented to him as he asked several repetitive questions about information that had just been explained to him." Doc. 39, p. 9. He reported hearing a voice calling his name but denied having any other hallucinatory experiences. Doc. 39, p. 10.

Defendant's Full Scale IQ (FSIQ) was measured to be 55, which is in the extremely low range of functioning and higher than only 0.1% of his peers. His verbal comprehension score, which is a measure of acquired knowledge, verbal reasoning, and comprehension of verbal information, was 61, which is also in the extremely low range and above only 0.5% of his peers. Doc. 39, p. 10.

Defendant's nonverbal reasoning abilities were measured by the Perceptual Reasoning IQ score. Defendant's score was 58, which is in the extremely low range. His Working Memory IQ was 74, which is in the borderline range and higher than 4% of his peers. His Processing Speed Index was 53, which is also in the extremely low range. Doc. 39, p. 10.

The Reliable Digit Span Score is an indicator of whether an examinee is putting forth adequate effort. Defendant's Reliable Digit Span score was 8, which indicated that he was putting forth adequate effort on the cognitive tests. Doc. 39, p. 11. The Structured Inventory of Malingered Symptomatology (SIMS) assessed Defendant's response style for

exaggerated or feigned mental health difficulties. Defendant's score was above the cut-off for feigning, but Dr. Micono indicated that "individuals with intellectual disabilities often obtain falsely inflated scores on this assessment" and that "there was no other evidence to suggest that he was feigning or exaggerating mental health or cognitive symptoms." Doc. 39, pp. 11-12.

Dr. Micono administered the Brief Symptom Inventory, which is a self-report inventory that provides a profile of an individual's current psychological symptoms. Defendant's symptom profile was in the mildly elevated range in comparison to the average outpatient client. Doc. 39, p. 11.

The Competence Assessment for Standing Trial for Defendants with Mental Retardation ("CAST-MR") was used to assess Defendant's knowledge and understanding of the trial process. The first section of the test assesses an individual's basic, factual knowledge and understanding of basic legal concepts. Defendant correctly answered 13 out of 25 of those questions. This score was similar to the score of individuals with mental retardation that are found to be incompetent to proceed to trial. Doc. 39, pp. 16-17.

The second section of the CAST-MR assesses the individual's ability to assist in the defense. Defendant answered 8 out of 15 of those questions correctly. This score was the same as the score of individuals with mental retardation who were determined to be incompetent. Doc. 39, p. 17.

The third section of the CAST-MR assesses an individual's understanding of their specific case events, such as where the individual was arrested or what their charges are. Defendant scored a 7.5 out of 10 on this section, which is between the average scores of

individuals with mental retardation who were found to be incompetent and those found to be competent.  Doc. 39, p. 17.

The Revised Competency Assessment Instrument ("R-CAI") was used to interview Defendant regarding his understanding of legal issues.  Doc. 39, p. 17.  Defendant had difficulty choosing appropriate responses to different situations that may arise as part of his case, and he could not articulate his reasons for choosing his responses.   He also did not have a complete understanding of the charges against him.  Dr. Micono noted that Defendant "had some factual understanding of the legal system; however, there were several elements that he stated he does not understand."  His limited factual understanding appeared to be related to his mild intellectual disability.  Doc. 39, p. 19.

Dr. Micono diagnosed Defendant with mild intellectual disability, mild cannabis use disorder, mild opioid use disorder, moderate methamphetamine use disorder, and adjustment disorder with mixed anxiety and depression.  Doc. 39, p. 12.[1]  Based on all of the data, Dr. Micono concluded that there was evidence to suggest that Defendant "suffers from a mental disease that significantly impairs his present ability to understand the nature and consequence of the court proceedings against him, and impairs his ability to properly assist counsel in a defense."  Though Dr. Micono found that Defendant was not competent

---

[1]  The diagnosis of mild intellectual disability required that three criteria be met: (1) deficits in intellectual functions, (2) deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility, and (3) the onset of intellectual and adaptive deficits during the developmental period.  Doc. 39, p. 13.

to proceed, she recommended that he be committed to a federal medical center for restoration to competency.  Doc. 39, p. 19.

### D.  Second BOP Forensic Evaluation

After the first BOP evaluation, Defendant was admitted to FMC Butner.  He was seen individually by forensic psychologist Gillespie Wadsworth.  Staff neuropsychologist Tracy O'Connor Pennuto performed a neuropsychological testing consultation.   Dr. Pennuto gave her report to Dr. Wadsworth, who incorporated it into the forensic evaluation. Dr. Wadsworth also considered the comments and observations from other members of the forensic team, correctional staff, and mental health staff who observed Defendant.  Doc. 42, p. 6.

Defendant attended two to three competency restoration groups per week.  One of the groups was the Competency to Stand Trial Group for Defendants with Intellectual Disability ("CST-ID").  A group facilitator noted that, after an extended period in this smaller group setting, Defendant was able to not only provide adequate information about the roles of courtroom participants and proceedings, but also to apply that information in a hypothetical scenario involving multiple charges, witnesses, and various aspects of evidence.  The facilitator opined that Defendant presented with good prognostic indicators of improvement.  Doc. 42, p. 11.

Defendant was also enrolled in the larger Competency Restoration Group; however, Defendant had difficulty understanding in the larger group setting despite remaining attentive.   Defendant was also provided competency restoration through individual interviews.  Doc. 42, p. 12.

Defendant was administered the Validity Indicator Profile ("VIP") to evaluate his effort and motivation during the second round of cognitive testing. His performance was considered to be valid and compliant, suggesting he was motivated to respond correctly. Doc. 42, p. 13. Several tests of effort and motivation, including measures embedded within the cognitive tests, indicated that Defendant's performances fell generally within expectation; thus, his test scores are likely to provide an accurate reflection of his cognitive functioning. Doc. 42, p. 15.

The Wide Range Achievement Test-Fourth Edition ("WRAT-4") assessed Defendant's basic word reading ability. His performance fell in the impaired range and was equivalent to a 3.5 grade level.

The WAIS-IV was once again administered to measure his intellectual functioning and cognitive strengths and weaknesses. His FSIQ was 79, which is in the borderline range. His General Ability Index ("GAI"), which reflects his overall intellectual functioning without the influence of processing speed and working memory, was also in the borderline range at 77. There was a notable discrepancy between his impaired verbal ability (66) and his average nonverbal ability (92). Accordingly, his intellectual functioning may be best understood as distinct abilities in verbal and perceptual domains, rather than looking at his overall FSIQ alone. Both his working memory and processing speed fell in the low average range. Doc. 42, p. 15.

Dr. Pennuto noted that Defendant scored significantly better than his previous performance, and the improvement was "substantially more than would be expected from practice effects alone." Because it is not possible to perform better than one's optimal

ability, Dr. Pennuto opined that it was likely that Defendant was not performing at his best during the previous administration of the WAIS-IV.  Doc. 42, pp. 15-16.

Overall, Defendant's evaluation revealed notable deficits in language skills in the context of otherwise intact abilities.  He demonstrated impaired performances in reading, vocabulary, and verbal abstract reasoning, but the majority of his other performances fell in the low average range or better.  The only exceptions were impaired performances on a test of verbal story recall, in which Defendant appeared overwhelmed by the quantity of information provided.  Doc. 42, p. 18.

Dr. Pennuto disagreed with the prior evaluations that diagnosed Defendant with an intellectual disability.  Defendant's cognitive abilities, including some aspects of language, appeared intact.  He possessed good cognitive reserve and cognitive capabilities to help accommodate for his weaker language skills.  Defendant showed that he was able to learn and recall both verbal and nonverbal information, though he greatly benefits from repetition of information.  Doc. 42, p. 18.

Dr. Wadsworth diagnosed Defendant with an unspecified communication disorder, methamphetamine use disorder, and cannabis use disorder.  An unspecified communication disorder occurs when an individual presents with symptoms characteristic of a communication disorder that causes significant distress or impairment in social, occupation, or other important areas of functioning but do not meet the full criteria for communication disorder.  Doc. 42, pp. 19-20.  The report stated that Defendant presents with reduced vocabulary and somewhat limited sentence structure, but he is able to engage

in a conversation appropriately. His limited communication skills may result in him presenting as more impaired than he actually is. Doc. 42, p. 19.

The Revised-Competency Assessment Instrument ("R-CAI") was used to assess Defendant's competency. Overall, Defendant's results indicated the he had learned basic legal concepts and was able to identify the roles of courtroom personnel. He correctly named his charges and recalled the possible sentence he would face if found guilty. He recalled the details surrounding the alleged offenses. He understood the risks and benefits of a plea bargain. He reported that he can assist his attorney by communicating what is "right and wrong" with regard to the allegations against him, and he expressed a plan to communicate with his attorney if he disagreed with how his case was being addressed. Doc. 42, pp. 20-21.

Dr. Wadsworth found that Defendant benefitted from competency restoration efforts and demonstrated an adequate understanding of the court process, various participants, and legal options. He also demonstrated the ability to learn and retain information. He was able to differentiate between his charges and apply disparate legal strategies. However, due to his impaired communication skills, he may not always effectively express his understanding of information. Doc. 42, p. 21.

Overall, Dr. Wadsworth found that Defendant is competent to stand trial. He "possesses a rational and factual understanding of the proceedings against him, appreciates his situation in reference to those proceedings, is able to maintain appropriate courtroom behavior, an is able to assist in his defense in a reasonable, rational manner." Defendant does appear to have genuine communication and language deficits and may need abstract

concepts explained to him in a simple and concrete manner.  Accordingly, Dr. Wadsworth recommended that, should Defendant proceed to trial, he would benefit from breaks during the day to ask counsel to explain parts of the proceedings he may not have understood. Doc. 42, p. 21.

### E.  Dr. Russell's Report

After the BOP issued its final report, Defendant's counsel retained Jennifer Russell, Ph.D., who conducted a competency evaluation of Defendant.  Dr. Russel administered several measures to assess effort and/or exaggeration or feigning of deficits.  Defendant's responses on these measures were not indicative of lack of effort or exaggeration of symptoms.  Doc. 55-3, pp.4-6.

Dr. Russell administered the Montreal Cognitive Assessment ("MoCA"), a cognitive screening tool used to identify those with cognitive impairments.  Defendant obtained a score of 20/30, which suggests mild cognitive impairment.  Doc. 55-3, p. 6.

Defendant again completed the CAST-MR, which he last completed during his first BOP evaluation.  His scores with regard to basic legal concepts and skills to assist defense, as well as his overall score, improved since the first time he took the test.  His score on understanding case events remained the same.  His total score and his scores on basic legal concepts and skills to assist the defense were above the average scores of individuals with intellectual disabilities who were found competent to stand trial.  His score for understanding case events was 7.5, which is near the average score of 8 for individuals with intellectual disabilities who were found competent to stand trial.  Doc. 55-3, pp. 6-7.

Dr. Russell noted that Defendant demonstrated factual understanding of the charges against him, though he struggled with more complex information.  He also demonstrated some knowledge of the various plea options available to criminal defendants.  He benefitted from the examiner's explanation of concepts he did not understand.  He demonstrated knowledge of the roles of various courtroom personnel, though he required brief education by the examiner.  Doc. 55-3, p. 8.

Defendant indicated that he has difficulty communicating with his attorney at times because his attorney uses "big words."  Defendant said that he has asked his attorney for clarification but often still does not understand.  Dr.  Russell opined that, given Defendant's intellectual deficits, particularly in the area of verbal abilities, "it is likely that, even with reasonable accommodations, [Defendant] would struggle to determine the specific advantages and disadvantages of various courses of action regarding his legal situation, to rationally apply such information, should he proceed to court at this time."  She also noted that his verbal and intellectual functioning would make it difficult for him to alert his attorney to pertinent information, evaluate the impact of witness statements and other evidence, understand information presented to him by his attorney, and understand the impact of the proceedings against him.  Doc. 55-3, p. 9.

Dr. Russell opined that Defendant met the criteria for Unspecified Communication Disorder, which is characterized by deficits in language, speech, and communication.  The diagnosis is given when an individual does not meet the full criteria for a specific communication disorder but exhibits relevant deficits that interfere with functioning and/or cause significant distress.  Doc. 55-3, p. 9.

Dr. Russel referred to the results of the second BOP forensic evaluation, which showed that Defendant functions in the borderline range of intellectual functioning, but that his intellectual abilities are not evenly developed such that his FSIQ does not accurately represent his overall intellectual abilities.  Doc. 55-3, p. 10.  His performance on the Verbal Comprehension Index is in the extremely low range, and his deficits in this area impact his competency-related abilities, such as his ability to communicate with counsel.  Doc. 55-3, p. 10.

Overall, Dr. Russell opined that Defendant "is presently unable to assist properly in his defense, secondary to verbal and communication deficits, though he is able to understand the nature and consequences of the proceedings against him, despite such deficits."  Doc. 55-3, p. 10.

Dr. Russell noted that Defendant received and benefitted from education regarding courtroom personnel and proceedings.  Given his demonstrated ability to learn and retain more simple information with repeated exposure, he would likely similarly benefit from education and treatment focused on assisting him in learning and applying information pertinent to his specific legal situation and to aid him in acquiring the ability to properly assist in his defense.  She recommended that, following any period of treatment, proceedings should resume quickly to reduce the likelihood that Defendant regresses with regard to his competency-related abilities.  Doc. 55-3, p. 10.

**F.  Hearing Testimony**

Dr. Micono, who conducted the first BOP forensic evaluation, testified at the hearing.  As a result of her evaluation, she concluded that Defendant had some factual and

rational knowledge about his case, but he also had some deficits in those areas. He demonstrated the ability to learn more information but did not demonstrate a complete understanding of the factual and rational aspects of the case.

Defendant demonstrated an adequate ability to assist in his defense, but given the deficits in his rational factual knowledge, Dr. Micono found that he was incompetent to proceed to trial. Tr. 14. Dr. Micono thought it was reasonable to try to restore Defendant's competency. His low IQ could not be restored, but low IQ alone does not make an individual incompetent to proceed. She felt there was a possibility that Defendant could learn more about his case and about the justice system in general. Tr. 15.

Dr. Pennuto testified regarding her participation in the second BOP evaluation. She stated that, overall, Defendant did "quite well" on his cognitive functioning tests. She said that he scored within the average to low average range across the majority of his testing. However, there were some exceptions. For example, his reading level was in the impaired range, and his performance of narrative learning and recall fell in the impaired range. Defendant's oral comprehension was in the high average range when he was given simplistic language, but as the complexity of the vocabulary increased, his comprehension decreased. Tr. 23.

Dr. Pennuto discussed Defendant's performance on the WAIS-IV, which assesses cognitive strengths and weaknesses, verbal and nonverbal abilities, attention in working memory, and processing speed. She noted that his FSIQ was a 79, but because of the discrepancies between his verbal and nonverbal scores, it was better to look at his individual scores rather than the overall score. Tr. 24. His verbal abilities were in the

extremely low range; however, Dr. Pennuto testified that this measure was "very educationally based." Tr. 36. His nonverbal abilities were in the average range and his working memory and processing speed were in the low average range. Tr. 24.

The results Defendant received with the tests administered by Dr. Pennuto were "significantly different" than those he received during the first BOP evaluation. Tr. 24. Dr. Pennuto explained that, generally, an individual is not able to outperform his abilities on an intelligence test, but "it is very easy to underperform." Tr. 25. She stated that, given the discrepancy between his performances on the two administrations of the WAIS-IV, "it leads me to believe that he was not giving full effort at the time Dr. Micono administered the test." Tr. 25. On cross examination, she stated, "There's no way for him to have an IQ of 55 when he is performing at the level he did with me; so the only explanation for that is that the results that were obtained previously are not valid and they don't represent his true abilities." Tr. 29.

Dr. Pennuto did not provide a diagnosis in her report. She provided her reports to Dr. Wadsworth, who then incorporated them into the forensic evaluation. Tr. 25. In the overall evaluation, Defendant was diagnosed with an unspecified communication disorder. This diagnosis is applied when there are symptoms of a communication disorder that do not meet the criteria for other specified language disabilities. Tr. 26.

Dr. Pennuto testified that, based on Defendant's performance and her interactions with him, she did not believe Defendant suffers from an intellectual disability. Tr. 26. She believes that he has some language deficits, but he was able to engage in reciprocal communication and did not struggle with conversations. On occasion, he would ask her to

repeat or clarify something.  When she did so, Defendant was able to answer appropriately, showing that he did understand.  Tr. 26.  Additionally, Defendant's performance on other tests of language showed that in some areas, "he is performing in the average to high average or even superior range compared to his peers."  Tr. 27.  She stated that Defendant's language deficits are not global, and he is able to communicate and function at a "much higher level" than one might ascertain just based on a conversation with him.  Tr. 27.

    Although Dr. Pennuto did not evaluate Defendant for competency, she disagreed with Dr. Russell's findings with regard to Defendant's abilities. Tr. 35.  She stated that Dr. Russell administered four effort tests, which only assess whether or not the results are valid but do not assess cognitive abilities.  Dr.  Russell gave one screening measure, the MoCA, which is usually administered to people with suspected dementia.  Dr. Pennuto did not feel that test was appropriate for Defendant.  She stated that Dr. Russell "didn't do any cognitive testing that was meaningful."  Tr. 35.

    Dr. Wadsworth testified regarding her participation in the second BOP evaluation. She testified that she used the information from Defendant's participation in the competency restorations groups, along with Dr. Pennuto's report, to inform her as to Defendant's abilities and limitations.  Tr. 39-40.

    Over a four-month evaluation period, Dr. Wadsworth interviewed Defendant using the revised competency assessment interview and conducted multiple individual interviews to assess Defendant's understanding of his legal situation.  Tr. 40.  Defendant self-proclaimed that he had learned new information over the evaluation process, indicating

that he benefitted from the competency restoration efforts.  He demonstrated an increased ability to understand his charges and think through his legal options.  Tr. 41.

Dr. Wadsworth, as noted in her report, diagnosed Defendant with an unspecified communication disorder.  She stated that Defendant presents with a reduced vocabulary and limited sentence structure, but there is no impairment in his discourse.  He is able to engage in reciprocal communication, but he tends to use more simplistic language and simple sentence structure.  Tr. 41-42.

Dr. Wadsworth testified that Defendant's testing indicated that he is more intelligent than he may appear in casual discourse.  "So because he uses more concrete basic language and simple sentences, that may allow the fact that he actually understands more and has a greater intellectual ability when it comes to his nonverbal knowledge, working memory, processing speed, and things like that."  Tr. 42.

Based on Defendant's testing, Dr. Wadsworth does not believe that Defendant suffers from an intellectual disability.  His school records showed that he had been diagnosed with a learning disability, but not an intellectual disability.  She also reviewed Dr. Sentell's report, which indicated a diagnosis of intellectual disability.  However, because that report did not provide scores for the WAIS-IV, Dr. Wadsworth was not able to ascertain a basis for that diagnosis.  Tr. 42.

Dr. Wadsworth noted that Defendant appears to have some impairment in adaptive functioning because he has never lived independently and does not handle his finances well.  Such inability to carry out the activities of daily living can point to an intellectual

disability; however, she thought his history of drug use may have "made him appear more impaired adaptively than he actually was." Tr. 43.

Dr. Wadsworth opined that Defendant has the ability to understand the nature and extent of the charges pending against him. Defendant was able to discuss possible sentences if he was convicted. During his final interview, he was able to provide disparate legal strategies to the different charges and used evidence that was consistent with the discovery material to aid in his thinking. Tr. 44.

Dr. Wadsworth further opined that Defendant is able to aid and assist his attorney in the preparation of a defense. Defendant engaged in reciprocal communication. When he is confused, he asks questions and requests clarification. Language and vocabulary issues can thus be addressed through education from counsel. Tr. 44-45.

Dr. Wadsworth testified that Defendant adequately demonstrated the ability to understand the nature and purpose of the court proceedings. He was able to identify the various plea options, risks and benefits of plea agreements, and the like. He understood his role in the proceedings and the role of other in the court. Tr. 45.

Dr. Wadsworth also agreed with Dr. Pennuto's opinion that Defendant's testing and results during the first BOP evaluation with Dr. Micono were not an accurate reflection of Defendant's true abilities. Tr. 48. She explained that "a person can only perform as well as their ability, so it would be nearly impossible for Mr. White to only be at 55 IQ, but perform at the ability of someone with a 79 IQ." Tr. 49.

Dr. Wadsworth testified that she did not see anything in Dr. Russell's report that indicated that Defendant was no longer competent to stand trial. Tr. 47. Defendant

completed his evaluation with Dr. Wadsworth following a four-month period in which he received extensive competency restoration efforts. Then, after a number of months without any competency restoration efforts, he was evaluated by Dr. Russell. Asked whether it was possible that Defendant had regressed between the two evaluations, Dr. Wadsworth stated that would be "highly unlikely." Tr. 49-50. She pointed out that Defendant performed better on the CAST-MR administered by Dr. Russell than he did on the same test in the first BOP evaluation. This indicated that he not only learned but retained the information over the many months between the evaluations. Tr. 50. She stated that he could have "lost" some of the information, but he demonstrated the ability to learn the information previously, which indicated that if he was reminded of things he may have forgotten, he would be able to retain that information adequately. Tr. 50. His intellectual abilities, however, would not have changed between the two evaluations. Tr. 52.

Dr. Russell testified regarding her August 2019 evaluation of Defendant. She interviewed him for one hour and 50 minutes and completed psychological testing. She also interviewed his mother for 30 minutes, reviewed discovery materials, and read the reports from the two BOP evaluations. Tr. 55. She conducted one cognitive test, the MoCA, a 10 to12 minute test. She also conducted a clinical interview with Defendant focusing on his current symptoms and functional abilities as they relate to competency. Tr. 62-63. A testing technician in Dr. Russell's office administered the CAST-MR as well as four tests to measure Defendant's effort. Tr. 61-62.

Dr. Russell testified that she did not observe any evidence to indicate that Defendant was malingering during the evaluation. The effort tests assessed his effort and response

style and did not show that he was exaggerating.  Dr. Russell felt that, during her personal interactions with him, he was putting forth adequate effort.  Tr. 56.

Dr. Russell did not administer an IQ test to Defendant.  She looked at the results of the two BOP evaluations.  She stated that Defendant's verbal IQ score, as assessed during the more recent evaluation was a 66, which places him very low in terms of his abilities in those specific areas.  She stated that would "affect things like his ability to understand and communicate his understanding of information that's presented verbally and to work with information that's presented in oral format."  She also concluded that, even with reasonable accommodations, Defendant would struggle to determine the specific advantages and disadvantages of various courses of action regarding his legal situation.  Tr. 57.  Ultimately, she concluded that he was not competent to stand trial.  Tr. 56-57.

As to the discrepancy between Defendant's score on the FSIQ in the two BOP evaluations, she said that it is possible for a person to test below their actual intellectual functioning, but it is less likely that a person will score significantly higher than their intellectual functioning. Tr. 58.

Dr. Russell felt that the information she had from the two prior IQ tests was sufficient to support her conclusion that Defendant was not able to assist in his defense at the time of her evaluation.  She opined that it was possible that Defendant regressed during the passage of several months between Dr. Russell's evaluation and the second BOP evaluation.  Tr. 59-60.

Defendant's total score on the CAST-MR improved between the first BOP evaluation and Dr. Russell's evaluation.  He improved on his understanding of basic legal

Page 20 of 24

concepts as well as his skills to assist his defense. His understanding of case events remained the same. Dr. Russell conceded that the results demonstrated that Defendant had learned and retained information between the two administrations of the assessment. Tr. 63-64.

**Analysis**

### A. Applicable Law

The Constitution "does not permit trial of an individual who lacks 'mental competency.'" Indiana v. Edwards, 554 U.S. 164, 170 (2008). "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171 (1975); see also Dusky v. United States, 362 U.S. 402 (1960) ("the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.") (internal quotation marks omitted) and United States v. Fields, 761 F.3d 443, 467 (5th Cir. 2014). Those constitutional standards are implemented by 18 U.S.C.A. § 4241, which guided the proceedings in this case.

Not all courts agree on who has the burden of proof. Wright & Miller, 1A Federal Practice & Procedure Criminal, Determination of Mental Competency, § 209 fn. 54-56 (5th ed.). The Fifth Circuit's view is that the burden is on the Government. Lowenfield v. Phelps, 817 F.2d 285, 294 (5th Cir. 1987), aff'd, 484 U.S. 231 (1988). "Once the defendant's competency has been called into question, the burden is on the prosecution to

show by a preponderance of the evidence that the defendant is competent to stand trial." United States v. Moghaddam, 299 Fed. Appx 418, 419 (5th Cir. 2008), citing United States v. Makris, 535 F.2d 899, 906 (5th Cir. 1976).

### B. Arguments of the Parties

Defendant contends that the Government has not met its burden of proving that he is competent to stand trial. Defendant argues that he has a lifelong history of mental deficit and illness, and Dr. Micono found him incompetent to stand trial after careful evaluations. Defendant points out that Dr. Micono states that Defendant put forth adequate effort and received an FSIQ of 55. He concedes that the testimony at the hearing "did not satisfactorily resolve the discrepancy" between his FSIQ as measured by Dr. Micono (55) and by Dr. Pennuto (79). But he points out that his verbal comprehension IQ was extremely low on both assessments. Defendant also points to Dr. Russell's diagnosis of unspecified communication disorder and her conclusion that Defendant would be unable to assist properly in his defense because of his verbal and communication deficits. He also points out that Dr. Wadsworth acknowledged that he may have "regressed" in the absence of restoration efforts.

The Government responds that, after effort tests, a short cognitive test, and the CAST-MR, in which Defendant scored 10 points higher than his original score, Dr. Russell concluded that Defendant is incompetent. The Government argues that Dr. Russell's report is insufficient to determine Defendant's competency. It points out that the majority of the tests were merely effort tests and were not administered by Dr. Russell personally. Defendant's score of 38.5 on the CAST-MR was above the average score (37.0) for

Page 22 of 24

defendants with intellectual disability who are found competent. Thus, the Government asserts that Dr. Russell's report and testimony are entitled to less weight. The Government argues that Dr. Pennuto and Dr. Wadsworth's extensive evaluations of Defendant should primarily be used to assess his competency.

### C. Findings and Conclusion

"Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." Godinez v. Moran, 509 U.S. 389, 402 (1993). After considering all of the evidence, particularly the testimony and reports of the BOP psychologists who conducted extensive testing and detailed evaluations of Defendant, the undersigned concludes that the Government has met its burden of showing that the modest aim is met in this case.

Defendant is now competent to stand trial. He does suffer from poor communication skills but he is able to engage in appropriate conversation. During restoration efforts, he learned basic legal concepts and the roles of courtroom participants. He now has an adequate understanding of the charges against him, the court process, and his legal options. Defendant now has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and he has a rational and factual understanding of the proceedings against him.

Due to Defendant's language deficits, the court and his counsel must take extra time to explain the on-going proceedings to him and afford extra opportunities for him to visit with his attorney. Defendant is represented by John Nickelson, an effective and extremely competent defense attorney. The undersigned is confident that Mr. Nickelson will take the

extra time and care that will be needed to explain the court proceedings to Defendant as this case moves to a conclusion.  The court will also explain matters with the knowledge that Defendant has the limitations discussed above and make reasonable accommodations to ensure that due process is afforded.

Accordingly;

It is recommended that Defendant be found competent to stand trial.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b).  A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 13th day of April, 2020.

**Mark L. Hornsby**
**U.S. Magistrate Judge**